Alright, next case we'll hear will be Mears v. Connolly, No. 21-1148. Go ahead, counsel. Good morning, Your Honor. Good morning. My name is Pat Dwyer. I represent the appellants June Laurie and Michael Mears, and I request four minutes for rebuttal. Okay, that'll be granted. Thank you very much. This is a matter that arises out of a young man who had been hospitalized at that point for three months at Greystone Park Psychiatric Hospital. He, as we allege in our complaint, and this is a pleading stage motion as opposed to one upon which facts could be or should have been found, he got progressively worse. On November 15th of 2017, he sat upon another patient, a much smaller, developmentally disabled person, and beat him such that he ended up in the ICU. Counsel, these facts are tough, but we do understand them. Perhaps we could just jump right into sort of the legal analysis, in particular the state-created danger. Well, the state-created danger, we believe, is relatively clear here. After the beating of the other patient, Dr. Joseph Young, who was on the treatment team and as part of the treatment team of Brendan Mears, the plaintiff's son, spoke to her and said, can you come in? Can you bring his favorite foods? We need to induce him into taking his medications. He had gotten progressively worse. Well, that's something that I had a question about. Who actually made the call? Was it the doctor reaching out to your client, or was it your client reaching out to the doctor when he supposedly gave her an insurance? My understanding, the initial call was made by the treatment team because they were so concerned about what had happened on the 15th. Dr. Young himself made the call? When's the last time you got a physician calling you on prompt? I don't know if that rises to Twombly Iqbal plausibility these days with men in care. Well, at this hospital, the treatment team acts as a group, and on several other occasions, Mrs. Mears had been called in to be part of discussions with them. Mrs. Mears was, at that time, a licensed psychiatric registered nurse. Okay, but give us the specifics of what is pleaded here. It sounds like what you're focusing on in your briefing is that she was told if she visited the hospital, brought his foods, she would be safe. She was asked to visit the hospital. Okay. It's more than just simply, you'll be safe. It is, we'd like you to come in and be part of this, to be part of his treatment by bringing his favorite foods to see if we can get him to take his meds. So she went from being at home, far away from his deepening psychosis, to being invited in, if you will, by Dr. Young and the rest of the treatment team. Tell me where in the complaint I should look for these facts. I've got it in front of me. I'm looking at paragraph 56. All it says is when asked on December 17th if it was safe to visit her son, she was assured. It doesn't say anything about who made the call. That is her second phone call. Okay. She went on the 16th to try and see him. This is the day after the assault on the other patient. He refused the visit. She then reaches out to the patient. Where is this pleaded? The specifics of the refusal of the visit is not pleaded. It's not pleaded. Were you given one chance to amend below? We were. Okay. So I have to go based on what's pleaded. Well, I'm trying to straighten out the second phone call, which is probably more germane. Right. I believe, and I'm not certain of this because June Laurie Mears has brain damage. Okay. So getting the details out of her about who called who is a little bit of an uphill struggle. We believe that she reached out to Dr. Young to inform him her son was now refusing to see her at all. He again reiterates the fact that she'll be okay, and please bring the foods. Please come up and see him. She's not the average lay person who's being asked to come up. She's somebody who has years and years of psychiatric care experience. She had been a charge nurse at Carrier Clinic, and she was a preceptor, training other nurses at Carrier Clinic. The way it's pleaded in paragraph 56 is that they encouraged her to visit him. It doesn't say who initiated the call. And that they should have but failed to notify him that it posed a danger. When she specifically asked if it was safe to visit her son the following day, this is paragraph 56, she was assured by Defendant Young it was safe. He encouraged her to visit Brendan and to bring food items that might appeal to her son as part of the therapeutic management disorder. So what you plead there is based on the foregoing encouragement and assurance of her safety, she presented herself for a visit. Okay. Now, I want to know, how is this different from the Ye case where we said general assurances are not affirmative actions so cannot form the basis of a state-created danger claim? We are relying upon the encouragement to come, not the assurance. The assurance goes to other causes of action in this case, but it does not go to the state-created danger. We believe that his asking her to come up and please be part of this is what brings her into the zone of danger. That happens in many contexts, though, doesn't it? I mean, parents, family members are encouraged to come to a hospital to visit a son, a daughter, a friend. That doesn't give rise to liability, does it? Well, when you have somebody who is this far out of control, it does. He is, sorry? Our precedent requires more. Ye says it has to amount to a restraint of personal liberty. Bright says it must have restricted her freedom to act, to protect herself. This doesn't satisfy either of those requirements. Well, if we watch carefully the video of the assault, which is part of the record here, she goes into the room. This is on the 18th, the day of the assault. She goes in and she is left in the room in a position with her son between her and the door. There's no way to get out. That's not a claim about Dr. Young. Now, I thought you would focus more on Nurse Oglesby, but you're spending almost all your briefing on Dr. Young. But Dr. Young isn't responsible for that. Well, we actually spend more on it than the defense does. They make no mention of Nurse Oglesby's conduct. If we're not persuaded that this satisfies the requirements of Ye and Bright, can you tell us why Nurse Oglesby's actions amount to, you know, affirmative actions that put her in danger and created foreseeable and direct harm? She is aware of the son's conduct over the past week or two where he's gotten very, very bad. She is fully aware of the requirement that every visit must be supervised. There's no exception to that. She is supervising a portion of that visit, at which time she decides to go out, leave the room, and leave him and June alone. Isn't this just ‑‑ I'm sorry. Go ahead. I was curious about that also. Did you get any information as to the reason for her departure from the room? We do have a reason for it. We found that out later on. She said she was going to see if somebody else might be available to take care of the visit. And she said she was available to do it if no one else was. I mean, what you're describing, though, seems just like a failure to protect. Not necessarily ‑‑ this is on behalf of the nurse. Just a failure to protect, and that doesn't meet our standard, does it? Well, in this regard, it is more than a failure to protect because she has the obligation from the get‑go to supervise, to be there. And if you watch the video, as long as she is in the room, Brendan Mears is staring at her. Can we even consider a video on a motion to dismiss? Well, it's part of the record, Your Honor. There's no record on it, I mean, unless it's something that's referred to in integral to the complaint, which I don't ‑‑ It was exactly referred to in the complaint. Where is it incorporated into the complaint? Give me one second. Both the video from the 15th and the 18th are referenced in the complaint and were part of the exhibits to the motion below. Okay. I'm surprised you're not leaning on paragraph 58 of the complaint. Paragraph 58 says it's not just that she was pulled away from someone else. She had ‑‑ June Laurie had testified against Nurse Oglesby that we might be able to draw some kind of inference about her motivation, that it wasn't just that she was busy, it wasn't just that she omitted to do something, but maybe this was a purposeful action putting her in harm. At this juncture, Your Honor, that's certainly an open question. We've had no discovery. It may well have been retaliation by her, but we don't know that. Right. I mean, that's the problem of determining these cases. But at this point, when you're opposing motion to dismiss, we have to draw all reasonable inferences in favor of you. Well, and that certainly was a way that the lower court was aware of that circumstance that Mrs. Mears had prepared an expert affidavit that partially dealt with Nurse Oglesby and a patient death at another state psychiatric hospital. So your argument is that Nurse Oglesby's presence, had she not left, might have or would have prevented the mother's injuries. That is exactly an inference the jury could make from watching that video. Within 20 seconds of Nurse Oglesby exiting the room, Brendan has his mother on the floor and is pummeling and kicking her. Now, the district court thought this was not foreseeable and direct because in the past he hadn't addressed any, first of all, it was sporadic violence. Second, he hadn't addressed any violence specifically to his mother. It was maybe patients, maybe staff. What do you have to say to that? Well, a couple of things to say about that. First of all, as we've indicated and as alleged, his psychosis was getting progressively worse. He was not taking medications. So the danger he represents is getting worse as time goes on. And with respect to mom, there's no indication that he would or would not have attacked her, but he was attacking people that were in close proximity to him. When he was questioned, and this is in the complaint, afterwards they said, why did you attack your mom? Answer, that wasn't my mom. He was so psychotic by then that he was not recognizing the woman he was beating to a pulp as being his mother. So this, if you will, kind of reaches into the scheme where expert testimony would be necessary in order to determine how sick he was and what was predictable or not predictable. Not only a person with all due respect. Of course, we're just looking at your Fourth Amendment complaint at this point, right? I understand that.  Just a question. Yeah, just. Sure. Was there anything in the record that would have alerted officials that this sort of assault, as serious as it was, would occur? There's two things. Anything that would have triggered, for example, the hospital officials or other nurses or doctors that this is not a good idea to leave this patient alone in the room? We make reference in the complaint to the note written by Dr. Livges, who was a psychologist, who, having watched the video from the 15th, watching Brendan marching up and down the hallway for four hours and then beating up this other kid, says we now realize how suddenly dangerous he can become and how difficult it will be to stop him if he does it. All right. Thank you. Thank you, counsel. We'll hear from your advisory. Good morning, Your Honors, and thank you. Brett J. Harrelson, Deputy Attorney General from the New Jersey Division of Law, peering for the appellees. May it please the Court, the Court should affirm, because at its core, this isn't a state-created danger case. It's a negligence case. This is a state common law tort negligence case. It's a failure to warn case, and it's a failure to supervise case. That seems like a fair description of what most of the people involved did. But the nurse brought her into the room, and then the nurse left. That's an action. That's not just the mom wandered into the room on her own. In violation of the hospital's own rules, she left her. And there's an allegation in there that suggests that she might have had bad blood against the mom. Why shouldn't we treat that as an affirmative action? Your Honor, any inaction could be characterized as an action in some way or another, and that was actually an issue before this Court in the Morrow case, where a girl who was being bullied at school ended up having to change schools because the school failed to expel the bully. And this Court, sitting and bank, rejected the plaintiff's characterization of the school's inaction as action. The plaintiffs had argued that the affirmative act was permitting the bully to return to school, and this Court rejected that argument. Okay. When I look at our precedents, I mean, you know, Morrow talks about, you know, putting someone in a position of danger and then failing to protect him. That counts as active. In Knight, you know, the police arresting the husband but then failing to provide any protection to the drunk wife who gets injured, that's an action. That's not just they omitted to take her home. In Rivas, where the first responders failed to tell police officers that the man having seizures shouldn't be restrained, that counts as an action. So we're not drawing, we're not just, you know, being very narrow in characterizing the, okay, failure to speak could be described as an inaction. But in the broader context, they took some responsibility for the situation and then they didn't do some other things once they put themselves in that situation. And that's kind of what happened here. Nurse Oglesby brought her into the room. Nurse Oglesby is there supervising. And then she takes herself away from protecting. Why isn't that analogous to Neep and Rivas? Respectfully, I would disagree with Your Honor's characterization of the action at issue in Rivas, which was not so much failing to advise the police that the patient suffered from seizures, but the actual paramedics' act of calling the police in the first instance. There was a dispute of fact in that case as to whether or not the man had attacked one of the paramedics. And Judge Fuentes, writing for the court, found that that was a dispute for a jury to resolve, that if the jury credited the plaintiff's version of events that no attack had ever taken place, then in fact the paramedics would have called the police for no reason, which was the act that set forth the, you know, the demise of the patient in that case who ultimately passed away. And then in Nype, the affirmative act was detaining this couple and separating them. But they didn't do anything to the wife. Well, they detained her, and then they let the husband go, and then presumably they let the woman go later. So I would argue – Letting her go. How is that – and actually, we're not exercising any control over it. They took control of the situation, and then they let her go. That's like what happened here. The nurse took control of the situation and then let her go. So, again, I would respectfully disagree with that characterization. Mears showed up at Greystone on her own volition to visit her son. She was not detained by police. When law enforcement stops you, you are obliged to abide and answer questions or what have you. In this case, she showed up at Greystone. She chose to go there. As plaintiff's counsel just said, she was a trained psychiatric nurse. She showed up on her own volition. The fact that Nurse Oglesby was the person who united them once she arrived at the facility and then left them alone shouldn't distract from the fact that ultimately, at its core, this was a failure to supervise. So then what do we make of the paragraph 58 allegation, which could plausibly be read as, there's some bad blood here. Nurse Oglesby is not merely neglecting, but she's setting up a situation to put her in harm's way. So nothing in the state-created danger exception analysis speaks to any sort of— I mean, if anything, it would speak to prong two, which would be the mental state required for the conduct to shock the conscience. But in this case, I think that would be more aptly applied had there been a First Amendment retaliation claim or something of that sort. We're not looking at that here. We're looking at a 14th Amendment substantive due process claim. Again, I would submit that this case is more factually analogous to Middle Bucks, where you have a student teacher who's supposed to be supervising a classroom, and male students are sexually assaulting women in a dark room and a unisex bathroom in the back of this classroom. What if the plaintiff in that case, and of course this court, again, sitting unbanked, decided that there was no action in that case, that that was a case of inaction? What if the teacher in that case failed to supervise because she were reading a book instead of supervising the classroom? Procedural posture in Middle Bucks, was that on a motion to dismiss? That was a motion to dismiss, yes. And I think the same issue could be raised in any case. You were supposed to be supervising, but instead you were eating your lunch. Had you not been eating your lunch, had you been paying attention, this wouldn't have happened. So again, to my point- That's not paying attention. She's doing more here. She's walking out of the room in a dangerous situation. Again, it was a dangerous situation that she didn't create, so I would- She didn't create it. No. I respectfully submit that the dangerous condition was when Mears showed up to visit her son and encountered him in the hospital. She brought her into the room where there are two people and one dangerous person, and one of them is an official person. The mere presence of the nurse might deter, and she takes away that presence. Isn't that at least plausible enough to survive a motion to dismiss? No, Your Honor, because our precedent clarifies that there has to be, as you pointed out while Plaintiff's Counsel was giving his remarks, some sort of a deprivation. We have cases, and it's not precedential here, but there was the Maxwell case where a teacher, similar to the facts of middle bucks, was sitting in a classroom, and there was a sexual assault in the back of the room. But in that case, the district judge found that there could be liability because the doors had been locked, and this teacher had locked the students in the room, and it was a special ed student as well. In this case, the video that Plaintiff's Counsel references, if you watch the video, which again was appended to the complaint, it was before the district court on the motion to dismiss, attached to the pleadings, it reveals that people were going in and out of the room freely. But people couldn't in that facility move about freely, right? She had to exercise her authority in order to open a door, didn't she? Based on my review of the video, which I believe was submitted with the plaintiff's appendix, and I believe Your Honors have a copy of that, if you view the video, you can see people coming and going out of the room without needing a key or some sort of a... Is it appropriate for us to consider that? I mean, are cases about considering attachments is only when there's like a document, a contract or something, that's integral to and relied upon by the complaint. This seems more like we ought to be, the judge should have converted it to summary judgment if the judge needed to watch the video. And if it needed to convert it to summary judgment, then we would have a chance to have affidavits, I don't know how good the audio is, like explanation or argument about how to interpret the video. I'm not sure this is a situation where the video is the very thing that's being pleaded or argued over here. Even so, I think the pivotal fact here, irrespective of whether the video should be relied upon or not, is the distinguishing factor here that Mears showed up on her own volition. What do you make of this pleading about her being encouraged to show up and provide favorite foods and other stuff? As Your Honor pointed out earlier, that the Ye case is fairly dispositive of that issue, that assuring someone that he or she would be safe isn't sufficient to constitute an action for purposes of the fourth prong of the state-created danger exception. Can you answer Judge Bevis' query about, it's an interesting point, can a piece of something extraneous to the complaint like this be appended to the complaint and be considered? Yeah, I could see where that could cause problems, where a plaintiff could just append all kinds of different evidence and maybe get over the hurdle of 12b-6. Is there a limitation in your, I mean, maybe you haven't considered this, but is there some sort of limitation on that? Unfortunately, I had not considered that, but I did review the complaint, saw that it had been referenced and appended there too. So, you know, assuming it would be considered, it does show that Mears was free to move about. If it's not considered, I would still propose that Mears fails to state a claim under the state-created danger exception. I understand from Mr. Dwyer that Brandon's behavior and conduct was known. His violent, or propensity for violent behavior was known. That being the case, isn't it so that Nurse Ogilvie was aware of that and put her on some sort of notice that maybe you shouldn't leave the room, leave him with somebody else in the same room, given a history of violent behavior, and apparently she was aware of that? Arguably, and that would speak to prong one, which would be the foreseeable and fairly direct element. I think with respect to Nurse Ogilvie, that argument is less compelling. From our perspective than prong four. But she was aware, I mean, she's been there for some while. And so in that context, she was aware that Brandon had violent behavior and tendencies. Isn't that accurate? At the pleading stage, I think that that's sufficiently alleged, where the court could assume that she was familiar with his propensity for violence, assuming it would probably be in his medical chart. So I think with respect to the foreseeability issue, that that would not really help Nurse Ogilvie in this matter. However, it doesn't mean that her leaving the room was a fairly direct cause of the injury. You don't see a but-for analysis here. I mean, if she had not left the room, the violence that occurred would actually maybe not have taken place because there would be somebody there supervising. Well, we will have no way of knowing that. So right now at the pleading stage, let's assume that that's true. May I ask what her job is, basically, while she's there in the room? In her capacity as a supervisor? I don't know, Your Honor. Unfortunately, I don't know. But let's say she had stayed in the room. How will plaintiff, if this goes into discovery, ever be able to prove that the attack would not have occurred? It's impossible. And for that reason, I don't think prong one is satisfied either, because I don't think that this harm was a fairly direct consequence of her leaving the room. There were three other people in the room. The other people in the room? Yeah, the video shows that there were other people in the room with them. Other roommates. I don't know who they are, but presumably at least one of them was a patient. Patients. And perhaps visitors. But this was not some tiny locked room. There's no other official, evidently, in the room. Staff? Anyone in uniform? Not that I'm aware of. So we have a situation where you might have a stronger argument if Nurse Oglesby had stayed outside the room and then Ms. Mears had decided to go in on her own. But Nurse Oglesby brings her into the room. Her presence is there. Her presence might be restraining violence. And then it's within this, like, this is within a 20-second period, right? Nurse Oglesby leaves and then Brendan attacks, correct? Mears stands up and approaches her son, at which point he then attacks the mother. And that was after Nurse Oglesby left the room. Okay. However, as I said, there's no way to know that the attack was causally related to Nurse Oglesby leaving the room. And we'll never be able to establish that. Well, I don't know. It's a but-for thing, isn't it? But for the fact that she left, the attack may not have occurred. Why can't we say that? And we're at the pleading stage. So, I mean, it's possible there could be more evidence developed about the circumstances in which the other attacks happened. We can't tell that from the face of the complaint. I see that my time is up. May I answer your next question? No, answer the question. Again, there are certain situations where I don't think it matters. And there's a case from the Seventh Circuit, the Doe case that was cited in our brief, where a law enforcement officer was called to investigate underage drinking and showed up, did nothing. And one of the girls who was with these underage drinkers was raped. Someone called the police a second time. The second officer goes out to investigate, and the first officer calls him up and tells him not to go, essentially. And the Seventh Circuit found that that was not sufficient because we would have no way of knowing, if that call never took place, what would happen if that second officer showed up. The rape may have still taken place. So that's analogous to this situation. We would never know what would happen if she had left the room. So for those reasons, I respectfully ask the Court to affirm. Thank you, counsel. Thank you. Then we'll hear rebuttal. I think the point to be made here is whether or not, taken together, the plaintiff's complaint puts together a plausible claim for relief. And we suggest that it does. And the issue here, because we are at the pleading stages, we haven't yet had the opportunity to find out how Brendan Mears would have reacted had the nurse stayed there. And we have not had the opportunity to bring in expert testimony to view what happened there and to offer expert opinion as opposed to our lay guessing as to what would have gone on had she stayed there. The other point I would simply make is this, that the fact that there is negligence and that there is unconstitutional conduct, one does not erase the other. In the variety of cases that have been discussed here, you could point to things that would seem to be negligent, such as the police in Neep. Was it the smartest thing in the world to leave her in the snowbank and run the possibility of her freezing to death? It certainly could be characterized as negligence. The fact that there is both negligence and unconstitutional conduct in this case does not, at this stage of the proceedings, compel a result whereby the state-created danger claim should be dismissed. Thank you very much. Thank you, counsel. We will take this case under advisement. We thank counsel for their excellent briefing and oral argument today. And we wish you well. Thank you.